**WILLIAM M. GRAHAM OIL & GAS CO. et al. v. OIL WELL SUPPLY CO et al.**

No. 17049.   Opinion Filed Oct. 4, 1927.

Rehearing Denied Dec. 20, 1927.

(Syllabus.)

1. **Contracts—Account Composed of Series of Items Furnished at Different Times for Same General Purpose Deemed a Single Contract.**

An account constituted of a connected series of transactions of items purchased or labor performed, or both, on separate orders and within short intervals of each other on different dates between the same parties, where all relate to the general purpose of the account, as in the development and operation of oil and gas leases situated generally in a certain locality or county, with irregular payments thereon, and the dealings between the parties indicate an expectation to continue such business relations, constitutes a "continuous running or open account" dating from the first item thereof, and is in law a single contract.

2. **Same—Indefinite Contract Made Definite by Performance—Oil and Gas—Materialman's Lien on Leasehold and Equipment—Time for Filing.**

A contract for the furnishing of materials, machinery, or supplies, or for the performance of labor or both, to be used in the digging, drilling, torpedoing, completing, operating or repairing of oil or gas wells on oil or gas leases situated generally in a certain locality or county, though at the inception of the contract it may be so indefinite that an action for damages will not lie for a breach thereof, and specific performance would not be enforced, yet, when a party fully performs his part of the contract, and the opposite party accepts the benefit of such performance, the element of definiteness is supplied, and it then becomes a binding and enforceable contract. And in such case a lien statement filed within the statutory period of the last purchase date will sustain a lien under section 7464, C. O. S. 1921, for the entire period of the account.

3. **Same — Payment — Accepting Note on Running Account not "Payment" so as to Render Subsequent Items Furnished on Account an Independent Transaction.**

In the absence of an agreement to that effect, or evidence that such was the intention of the parties, the taking of a note for existing liabilities does not constitute a payment of the debt. And in the case of a continuous running or open account, a note given substantially for the balance thereof, without such intention, is not an adjustment equivalent to a settlement to constitute as a separate and independent transaction, a continuation of the account between the same parties comprised of like items which relate to the same general purposes of the account to the date of such adjustment.

4. **Oil and Gas—Statutory Lien on Leasehold and Equipment for Labor and Material—Right to Lien for Rental on Drilling Tools.**

By virtue of section 7464, C. O. S. 1921, any person, corporation or copartnership, who, under contract express or implied, performs labor for or furnishes the owner of oil and gas leases with materials, machinery, or supplies used in the digging, drilling, torpedoing, completing, operating or repairing of oil or gas wells, has a lien upon the oil and gas lease, the buildings and appurtenances, the materials, machinery or supplies so furnished, the oil or gas well for which they were furnished, and upon all the other oil or gas wells, fixtures and appliances used in the operating for oil and gas purposes upon the leasehold for which said material, machinery, or supplies were furnished or labor performed. And in the case of materials, machinery or supplies furnished, the lien attaches whether such commodities become a part of the leasehold as

by consumption in use or annexation, or retain individuality and be capable of further use, though such commodities be furnished for hire, as in the case of drilling tools furnished to and used by the owner of the oil and gas lease or leases at a stipulated per day rate of rental. The case of Arkansas Fuel Co. v. McDowell, 119 Okla. 77, 249 Pac. 717, to the extent of conflict herewith, is overruled.

**5. Same—Construction of Statute—"Furnish" and "Used."**

The term "furnish," as used in section 7464, 'C. O. S. 1921, means to supply a thing for use in the accomplishment of a particular purpose; and the term "used" means the employment of a thing for the accomplishment of a particular purpose.

**6. Same—Priority of Statutory Lien Over Subsequent Incumbrances—Priority Determined by Date of Furnishing First Item of Running Account.**

By virtue of section 7464, C. O. S. 1921, where liens are established thereunder upon continuous running or open accounts for materials, machinery, or supplies, or for labor performed, furnished to the owner of oil and gas leases, used in the digging, drilling, torpedoing, completing, operating or repairing of oil or gas wells on such leaseholds, and, where such accounts are existent at the time of incumbrances by others, such liens are superior and prior to the lien of incumbrancers of said oil and gas leases or any part thereof made subsequent to the date of the furnishing of the first item or the date of the performance of the first labor. Like accounts made subsequent to incumbrances otherwise, upon which liens are established, are junior and inferior to recorded incumbrances by others, or of which such account creditors have actual notice, made prior to the date of the furnishing of the first item of material or the date of the performance of the first labor.

**7. Same—Contract Between Creditors and Insolvent for Joint Operation of Oil Lease Enforced According to Terms.**

Where creditors of an apparent insolvent concern agree on the joint operation of oil and gas properties of the insolvent under certain definite terms, in case of litigation involving the contract, with one of the parties urging a reformation thereof on the ground of conflict with a prior contract between the objecting party and the insolvent, courts will not undertake to make a different contract for the creditors but will decree performance conformably to the terms thereof.

**8. Same—Reasonable Fees for Lien Foreclosures.**

By virtue of section 7482, C. O. S. 1921, in the foreclosure of liens, the court is authorized to fix and award a reasonable attorneys' fee commensurate in amount to the service performed in the particular case. Fees ranging in amount of approximately 10 per cent. to 25 per cent. of the amounts of liens decreed in the instant case, held not to be excessive.

**9. Appeal and Error—Review—Conclusiveness of Findings of Fact—Modification of Judgment Where Law Misapplied.**

Where a jury is waived, and the cause tried to the court without a jury, and the findings and judgment of the trial court are amply supported by the weight of the evidence adduced at the trial, the appellate court is not at liberty to disregard the findings and judgment of the trial court. In such case, if it appears that the trial court made an erroneous application of the law to the facts found, the appellate court will modify the judgment by making the correct application of the law and affirm the judgment.

Commissioners' Opinion, Division No. 1.

Error from District Court, Osage County; Jesse J. Worten, Judge.

Action by the Oil Well Supply Company et al. against the William M. Graham Oil & Gas Company et al., consolidated, for foreclosure of liens. Judgment for plaintiffs, and defendants William M. Graham Oil & Gas Company and Prairie Oil & Gas Company appeal. Modified and affirmed.

T. J. Flannelly, Paul B. Mason, Chas. E. France, A. L. Jeffrey, and Burford, Miley, Hoffman & Burford, for plaintiffs in error William M. Graham Oil & Gas Company and Prairie Oil & Gas Company.

Randolph, Haver, Shirk & Bridges, for defendants in error Oil Well Supply Company, Bessemer Gas Engine Company, Lon R. Stansbery, and Black, Sivalls & Bryson, Inc.

Hulette F. Aby, William F. Tucker, and Frank Settle, for defendant in error Frick-Reid Supply Company.

G. C. Spillers, for defendant in error F. W. D. Truck Company.

Hamilton, Gross & Howard, for defendant in error Atlas Supply Company.

TEEHEE, C. In 1920, William M. Graham and W. E. Graham were the owners of certain undeveloped oil and gas leaseholds situated in Osage county. For the purpose of the development thereof they established a line of credit with certain supply houses and dealers, hereinafter named, from whom they purchased materials, machinery, and supplies at intervals as needed and required. Such commodities were purchased on ac-

count, whereon, in several cases, payments were made at such times as were convenient. Lessees were successful in their enterprise, and in due course of their operations, reduced to possession and control crude oil in large commercial quantities. Thereupon, as a part of their operations, they established a refining plant on a part of a certain leasehold, the surface title to which area of the land thus occupied they purchased. The materials used in the construction of the refinery and mechanical equipment thereof, and the necessary supplies, the lessees likewise purchased from certain of said dealers, and as required and needed in the same manner as such commodities were purchased in the development of their several leaseholds.

For the purpose of providing immediate funds for the further development and improvement of these leaseholds, with the view of increasing the production therefrom, the lessees, on July 1, 1920, entered into a certain contract for the advance sale of their products to the Prairie Oil & Gas Company under certain fixed terms. At the time of this contract they had resolved their enterprises into corporate entities under the names of the William M, Graham Oil & Gas Company, the Graham Gasoline Company, and the Graham Drilling Company, and under these designations, as well as individuals, the contract mentioned was executed. Under this contract the lessees covenanted to sell all of their production to the Prairie Oil & Gas Company for a specified term, in consideration of which the Prairie Company paid the lessees $700,000, as advance purchase price, whereon the runs of oil each month were to be credited at the market price until this amount together with interest at six per cent. was liquidated; and in addition to other appropriate covenants it was agreed as follows:

"The vendors do not guarantee any certain or fixed amount of oil production upon the oil and gas mining leases and interests above described, but vendors agree that during the life of this contract all of said producing leases and said interests therein and also undeveloped leases, if they justify it, and any other lands or oil properties hereafter acquired by vendors, will be diligently drilled, developed, and operated and that oil will be produced therefrom in the usual and customary manner. * * *

"If at the end of 30 months from July 1, 1920, the vendee shall not have received an amount of oil sufficient to liquidate the obligation of vendors to vendee arising out of the said advance of said sum of $700,000 and interest thereon, as herein provided, then and in that case it is agreed that ven-

dors will, on demand, pay the balance due and owing in cash. Thereupon this contract shall wholly terminate and end and neither of the parties hereto shall be under any further or additional obligations to each other.

"It is agreed that inasmuch as this contract, so far as vendee is concerned, is made for the purpose of securing deliveries of oil, as herein provided, and not a loan for the return of money advanced, in the event there is any breach or violation of the provisions or covenants of this contract, vendee shall have a first and prior lien on the properties, rights and interests of vendors mentioned and referred to herein and more particularly described in 'Exhibits A, B, C, and D,' to secure any unpaid balance of the amount advanced by vendee to vendors under this contract, and shall have the right and authority to take charge of any or all of said properties and operate them for the benefit of the parties in interest. * * *

"The vendors agree and warrant that all of the lands and leases affected by this contract and the tools, machinery, and material, supplies and properties of every nature and kind owned and used thereon, or in connection therewith, are free and clear of all liens, mortgages or incumbrances whatsoever, and that during the life of this contract vendors shall not in any manner cause or suffer the same to be incumbered."

The contract was filed for record in Osage county on September 29, 1920. Other subsequent agreements were entered into by the signatory parties, which were involved in the trial court, but are not here urged for our consideration.

At the time of recordation of the contract the Graham concerns, operating either in the names of the lessees, or under their corporate names, were indebted on account to said dealers for commodities purchased under their credit arrangement. Thereafter, in the diligent prosecution of their business as required of them under the terms of the contract, lessees continued to purchase materials, machinery, and supplies from said dealers for use in their further operations. In due course, by reason of depressed conditions then existing in the oil industry, the Grahams encountered financial difficulties whereby they were unable to meet their indebtedness to various creditors, then approximately $800,000 by reason whereof the creditors on July 8, 1921, entered into an operating agreement. This contract, upon recitation of the necessity thereof, provided for the application of the revenue derived thereunder as follows:

"1. To pay all operating expense.

"2. To repay to itself all sums and amounts which it may hereafter advance,

on account of unpaid labor expenses at the time of taking possession of property, with the further understanding that the Prairie Oil & Gas Company, if it desires to advance the money, may settle or compromise other small outstanding claims heretofore incurred by the W. M. Graham Oil & Gas Company, in connection with this property, said amounts to be repaid said Prairie Oil & Gas Company from the receipts of the sale of oil or other property.

"3. To pay to the bank creditors of the said W. M. Graham Oil & Gas Company interest at the rate of 6 per cent. per annum on the notes of said company, for a period of 6 months.

"4. To retain all the residue to await the further action of the creditors; being further agreed that all creditors, including those having lien rights, will forego the institution of any proceedings to foreclose said liens, or to proceed against said company in the courts, for a period of ten months from this date; it being further understood that nothing herein contained shall be construed as preventing such creditors. as may have the right to file mechanic's liens from filing such lien in compliance with the mechanic's lien law; it being further understood and agreed that all the undersigned creditors agree to reduce interest charges to a basis of 6 per cent. per annum from this date, the Prairie Oil & Gas Company further agreeing to reduce the interest on its claims to 5 per cent. per annum.

"It being further understood and agreed that any and all sums of money in the hands of the Prairie Oil & Gas Company at the expiration of ten months, received from the properties hereinabove mentioned under the provisions of this contract, shall be understood to be and treated as a part of the oil and gas lease and leasehold estate, and subject to any priorities to which any of the undersigned might be entitled if the same were a part of said lease and leasehold estate."

Upon expiration of the ten-month limitation several creditors who had theretofore filed material liens brought suit on their accounts for judgment against the Graham concerns and foreclosure of their liens. The first of these was filed on May 11, 1922, and the last, on June 9, 1922. In these actions the Prairie Oil & Gas Company and other lien creditors were also joined as defendants.

In due course, the cases having been render ed at issue. they were consolidated under the case filed by the Oil Well Supply Company, with the status of the parties here named and involved in this appeal being, either upon original or cross-petitions, plaintiffs, to wit, Independent Torpedo Com-

pany, Black, Sivalls & Bryson, Inc., Bessemer Gas Engine Company, Lon R. Stansbery, F. W. D. Truck Company, Atlas Supply Company, Frick-Reid Supply Company, and Oil Well Supply Company; and with the William M. Graham Oil & Gas Company, admittedly the owner of all the Graham properties, as the principal defendant; and with the Prairie Oil & Gas Company a codefendant as to the plaintiffs above named, and itself a plaintiff upon a cross-petition against the principal defendant for judgment for the balance due it by the principal defendant under the contract of July 1, 1920, and against all of the plaintiffs above named upon the merits of their claims, and in respect to the relative rank of their liens, if any they held, with the lien claimed by the Prairie Oil & Gas Company under said contract upon all of the properties of the principal defendant.

A jury being waived by all the parties, the hearing of said cause was begun by the court on March 17, 1924. There were adjourned hearings of said cause. It developed that there was no material dispute of the amount of the various claims nor the manner of their creation. The cause thus resolved itself into questions of law.

Upon completion of the evidence and argument by respective counsel, the cause was taken under advisement, and on June 15, 1925, the court rendered judgment in favor of the plaintiffs above named for the respective amounts of their claims with slight modification in some cases, with interest from the date of the filing of their respective liens; and adjudged that their liens were superior liens but of equal rank as to properties affected by more than one of such liens, and in foreclosure thereof ordered the sale of such of the properties involved.

On the cross-petition of the defendant Prairie Oil & Gas Company, the court rendered judgment against the Graham concerns in the amount of the Pipe Line Company's claim under its contract of July 1, 1920, and adjudged said contract to be an equitable lien upon all of the properties of the principal defendant involved in the consolidated cause, but with a rank junior to all the liens of the several plaintiffs above named, and, in foreclosure of said lien, likewise ordered the sale of all of the properties thus impressed. In this respect the court further ordered an accounting under the joint operation of the properties from the date of the creditor's agreement with admeasurement of the right of the lienors

in the net proceeds as in the case of the other properties.

The court further rendered judgment for the several plaintiffs above named, for certain sums as attorney's fees with equal rank of the liens wherein such fees had accrued.

The principal defendant and its codefendant, separately and collectively, excepted to the judgment in respect to the liens decreed in favor of the plaintiffs; and the defendant Prairie Oil & Gas Company further excepted to the judgment in the respect that its lien was adjudged to be inferior and junior to the liens of the plaintiffs otherwise decreed to have prior and superior liens. Proper motions for a new trial were filed by the defendants which were by the court overruled, whereupon the cause was brought to this court for review.

For purposes of clarity, where this be necessary, the parties will be referred to according to their status in the trial court, or as plaintiffs by name, and the defendant William M. Graham Oil & Gas Company as lessees, and the defendant Prairie Oil & Gas Company as the pipe line company, or as defendants by name.

In this appeal there are 71 assignments of error, largely repetitive however, by reason of the number of cases involved. Thereunder, complaint against the judgment rendered is made in the alternative by the defendant William M. Graham Oil & Gas Company, in that the several plaintiffs "were not entitled to liens on the respective parts of its properties as adjudged by the trial court, or that the amount for which such lien was established was too large," in which the defendant Prairie Oil & Gas Company joined; and the defendant Prairie Oil & Gas Company further complains "that the court erred in adjudging that the several liens decreed in favor of the respective defendants in error (here referred to as plaintiffs) upon the various parts of the property involved in the action was prior and superior to that decreed in its favor on said properties." Since there is no controversy between the defendants in respect to the judgment rendered on the cross-petition of the one against the other, the complaint here made by the one in effect is the complaint of both. For that reason no distinction in our consideration hereof will be made unless clarification so requires.

These contentions are presen'ed under two propositions, namely:

"First. Upon the date of the execution and delivery (July 1, 1920) of the agreement, Exhibit p 1 (2367) all the properties involved in this action were mortgaged to the Prairie Oil & Gas Company and charged with a lien as security for the performance of all the obligations of the William M. Graham Oil & Gas Company and the other parties thereto, including the obligation to pay in cash, at the expiration of 30 months any part of the sum of $700,000 with interest then remaining unpaid.

"Second. All third persons (although without actual knowledge thereof), became charged with notice of the lien from the date the instrument was deposited in the office of the county clerk for record, to wit, September 29, 1920, at nine o'clock a. m. And any lien upon or interest in the property acquired by third persons subsequent to that date, is subordinate and inferior to the lien of the Prairie Oil & Gas Company arising by virtue of the instrument."

Upon the first proposition defendants have presented a forceful argument in support of the principle of law involved, which the trial court applied to the contract of July 1, 1920, between the parties defendant. The court adjudged the contract to be an equitable lien upon all the properties covered thereby, effective as such, however, as to the plaintiffs in this action from the date of record thereof. In our view, though it is unnecessary to so determine, the court accorded to the contract all the dignity to which it was entitled as there was no proof to show that plaintiffs had due notice thereof otherwise. As we understand the defendants' argument, they do not contend that this is not the legal character of the contract, nor do we understand that their complaint goes to the extent of challenge of the judgment in this respect. This being true, then no phase of the legal principle applied requires consideration by this court, as no cross-appeal by plaintiff is pending, though they have made counter argument which, in effect, except for a difference of view in the time of application to the case in hand, is affirmative of the action of the trial court. Section 782, C. O. S. 1921; Turner v. Mills, 22 Okla. 1, 97 Pac. 558. This phase of the case does not involve the question of lienable accounts and the relative rank thereof as liens, as that is for determination under the second proposition; hence, with this observation, we dismiss this from further consideration as not being involved in the appeal.

Under the second proposition our first consideration will be directed to the character of the accounts on which the lien claims of plaintiffs are based as the determination of this phase must furnish the key to a proper adjudication of the matters in controversy. There appears to be no dispute upon the

facts in respect to the accounts as found by the court. The controversy is upon the legal principles applied thereto. All of these accounts are alike both in origin and character; hence the proper classification of one is the classification of all. For this purpose we select the account of the plaintiff, Frick-Reid Supply Company, wherein are present the characteristics common to all, and contains an additional element common only to several, which, if defendants' contention in that particular is correct, differentiates this and like accounts from the others. A brief history thereof is therefore necessary.

This account had its inception upon the application of one of the lessees, for a line of credit from this plaintiff, whereunder materials, machinery, and supplies were to be furnished when and as required and needed by the lessees in the due course of the development and improvement of their leasehold. There was no definite agreement upon the quantity of the particular commodities, the total cost thereof, the particular lease or leases to be developed, nor as to the number of proposed wells or other improvements with their location. The only definite understanding between the parties was, that the lessees were owners of leaseholds situated in Osage county, and that for development thereof the line of credit was granted. This negotiation occurred about February, 1920. The first item of purchase was on March 1. 1920. Thereafter repeated purchases were made on divers dates with the longest interval being less than 30 days. At the date of the contract of July 1, 1920, the account was $16,936.54. Without considering cash credits made between the dates of the contract and recordation thereof, the account at the date of recordation on September 29, 1920, was approximately $18,500. Subsequent to July 1, 1920, cash credits on the account aggregating $14,494.91 were made. There were also several promissory notes given by the lessees to the plaintiff for certain amounts of the account maturing on fixed dates. There was no settlement of the account at the time of execution of the July 1, 1920, contract, unless, inclusive of cash credits aggregating $10,404.91, a promissory note for $6,500, given shortly thereafter, may be so held; nor at the time of record thereof. Subsequent to the recordation of the contract, further purchases were made, the first being on September 30, 1920, and likewise thereafter at intervals. The longest interval was less than 30 days. The last purchase during this period was made on July 15, 1921. At the date of the creditors' agreement of joint operation, on July 8, 1921, including promissory notes, there was a balance of more than $25,000 due on this account. The lien statement, which included the amount represented by the promissory notes mentioned, was filed on August 16, 1921, within the statutory period of four months of the date of the last purchase. Under this state of facts the court found and held, as a matter of law, that the account was a continuous running account; in other words, that this course of dealing constituted a single transaction. In this application of the law defendants contend that the court erred.

The defendants' theory is that each purchase constituted a separate and independent transaction, as there was wanting at the inception of the account the necessary element to constitute the entire account as a single transaction, that of a meeting of the minds of debtor and creditor of approximately what would be required in the character of materials and the quantity thereof for the development of specific properties, and to render them into a proper state of improvement as productive oil properties, for which they were exploited; and that the promissory notes in their respective amounts, given by the lessees to the plaintiff, together with the cash credits, were in settlement of such amounts of the account, and thus to that extent rendered it a closed account at the time of these transactions. If either of these contentions is capable of sustention under the record, it, of course, would follow that the court's holding in this respect was error.

In the nature of the oil industry fraught with the element of chance, and with the mineral sought being of a fugitive character, it must be admitted that there could exist in the minds of the contracting parties only the certainty that there would be required a vast quantity of materials for use in drilling operations and improvements, with much thereof in fact to become no part of the improved property as by attachment, with the cost of the whole of the materials required incapable of exact ascertainment until completion and a casting up of the account, and with the number of wells to be drilled indeterminate and dependent upon the result of the first, second or third effort, on the particular lease. When the depth of the pay sand has been ascertained the cost of subsequent operations in the particular territory is more or less capable of fairly accurate estimation. This is true likewise in the cost of maintenance upon rendition of the leasehold to a state of productive development, as continued operation

is not without interruption through mishap or breakdown of machinery. The manner therefore, of the creation of the relationship of debtor and creditor in the transaction here involved is one common to the oil industry where the lessee undertakes to develop his leasehold upon his own account rather than by means of contracting the development to others engaged in the drilling of wells under fixed contractual terms.

In the case of this transaction, therefore, the minds of the parties met on two grounds, namely: That lessees owned certain oil and gas leases in Osage county, which they desired to develop, and for that purpose sought a line of credit from plaintiff; plaintiff owned a stock of the kind of supplies needed and granted the line of credit sought. As a result of the agreement, the necessary commodities were purchased when and as required, and through the use of them the hidden reservoir of liquid gold was tapped by the cold point of steel and made to flow through the coffers of lessees into the channels of trade and commerce.

In the circumstances of the dealings had between the parties, we think the court properly concluded that the same constituted a continuous running account, and thus a single transaction. The terms "continuous" and "running," in the language of commerce, have a convertible or exchangeable application, so that a continuous account and a running account are one and the same thing, and when these terms are applied singly or jointly to commercial transactions of the character here involved, it is meant that the account is an open one or without break or interruption, as by settlement or adjustment having the force of a settlement. and constituted of a connected series of transactions. as by labor performed or merchandise sold or both, where they have a relation to the general purpose of the account as here.

In Fields v. Daisy Gold Mining Co., 25 Utah, 76. 69 Pac. 528. the court, addressing itself to this subject, said:

"In general, we consider the proper rule to be that, when all the items in . the account relate to one continuous transaction between the same parties, although the goods were delivered on separate orders, and at different dates. within short intervals of each other, and the dealings of the parties indicate an expectation to continue such business relations, the transactions constitute a continuous running account, regardless of intervening irregular monthly balances in the account, which dates from the date of the last item delivered, and relates

back to the time of the first delivery of material under that course of dealing or contract shown"

—and that:

"Part payment and settlement do not necessarily defeat the running nature of an account upon which a lien is filed."

Thereupon the court laid down the principle that:

"When all the items of a materialman's account relate to one continuous transaction between the same parties, and their dealings indicate an expectation to continue such business relations, the account will be regarded as continuous and running, and dates from the first item thereof, though the goods are furnished on separate orders at different dates, and there were intervening irregular payments on monthly balances in the account."

That such course of dealings as shown by the record in the case at bar constitutes a continuous running or open account, and only a single transaction, and not as many as there were separate orders, as by the defendants contended, appears now to be well established as,

"When material is furnished, to be used for the same general purpose, as in the construction of a building, though the material be ordered and furnished at different times, yet, if the separate parts form an entire whole and are so connected as to show that the parties intended that they should form one complete transaction, and that they should constitute one account, then the entire transaction constitutes a single contract."

—and that by virtue of the rule. a lien statement filed within the statutory period of the last purchase date will sustain a lien for the entire period of the account. Sherbondy v. Tulsa Boiler & Machinery Co., 99 Okla. 214. 226 Pac. 564; Joplin Sash & Door Works Co. v. Oklahoma Presbyterian College. 36 Okla. 547, 129 Pac. 40, 43 L. R. A. (N. S.) 158; Redman v. Murray W. Sales Co.. 266 Fed. 272; American Tank Co. v. Continental & Commercial Trust & Savings Bank. 3 Fed. (2nd.) 122; Kaiser Lumber Co. v. Moseley. 56 Ark. 534; Hill v. Imboden. 146 Ark. 99, 225 S. W. 330; Denniston & Partridge Co. v. Howell (Iowa) 179 N. W. 179; Wertz v. Ryan. 192 Ia. 517, 184 N. W. 1032; Van Wart v. Rees, 112 Me. 404, 92 Atl. 328; Premier Steel Co. v. McElwaine-Richards Co.. 144 Ind. 614. 43 N. E. 876; First National Bank vfl Federal Supply Co., (Tex. Civ. App.) 260 S. W. 881.

In this class of transactions, where, at the inception thereof there may be lacking that

element of completeness of contract, whatever may be the rule elsewhere in such circumstances, this may be now regarded as incontroversial in this jurisdiction, for,

"While a contract may be so indefinite that an action for damages will not lie for a breach thereof and specific performance would not be enforced, yet when a party fully performs his part of the contract, and the opposite party accepts the benefits of such performance, the element of definiteness is supplied, and it then becomes a binding and enforceable contract." Sherbondy v. Tulsa Boiler & Machinery Co., supra.

Prior to the date of the contract of July 1, 1920, there were no cash credits on the account. During the interim between the dates of the contract and recordation thereof, two cash credits aggregating $10,494.91 were made on the account, the first on August 11th, and the other on the 16th of that month. One note was given during this interim; this was a 60-day note for $6,500 dated August 10th. The cash payments alone were insufficient to liquidate the account, as is clearly indicated, and were considered as credits thereon as in due course. The proof was that the account was not treated as closed at the time of any of these transactions, and that the note given was not considered as a settlement of the amount represented thereby, but merely as a convenient way to handle the account. There were several other subsequent similar transactions not here necessary to detail which were treated and considered as those above detailed. Thus it clearly appeared that the adjustment of the account in the manner outlined at none of these transactions was considered as having the force of a settlement thereof. The cash credits of themselves not being sufficient to settle the account in their respective amounts at the time of such payments, the giving of promissory notes, as here, did not have the effect of terminating the character of the original transaction establishing the account, and to constitute the continued account between the parties thereafter as a separate and independent transaction, as the record lacks the legal requisites to constitute the notes as settlements of the account to the extent of their respective amounts at the dates thereof.

"In the absence of an agreement to that effect, or evidence that such was the intention of the parties. the taking of a note for existing liabilities does not constitute a payment of the debt." London & San Francisco Bank v. Parrot. 125 Cal. 472. 58 Pac. 16, 73 A. S. R. 64; Eddy v. Lloyd. 90 Ark. 340; Meek v. Parker, 63 Ark. 367; Allis v.

Distilling Co., 67 Wis. 16; First National Bank v. Case, 63 Wis. 504; Ford v. Wilson, 85 Ga. 109; Lumber Company v. Christopher, 62 Mo. App. 98; Haney-White Co., v. Stafford, 96 N. J. L. 283, 114 Atl. 746; Shepard v. Allen, 16 Kan. 182; Van Stone v. Stillwell & Briscoe Mfg. Company, 142 U. S. 128, 35 L. Ed. 961.

The principle of these cases is indeed recognized by the law of this state. Sections 7462 and 7478, C. O. S. 1921; Mutual Life Insurance Co. v. Chattanooga Savings Bank, 47 Okla. 748, 150 Pac. 190; Bowles v. Biffles, 50 Okla. 587, 151· Pac. 193. The accounts of all the plaintiffs in this cause, therefore, having originated and continued in like manner as the one detailed, though in some cases the interval of purchase was four months, and others without cash credits or notes, and all being for materials, machinery and supplies or labor purchased, and used by the lessees in the development of their leaseholds as productive oil and gas properties, either in the form of crude or refined products and the operation and maintenance thereof, with the record amply supporting the findings of the court, it must follow as a legal proposition that the court did not err in the judgment rendered upon this phase of the case.

This brings us to the crux of the case, which involves the application of section 7464, C. O. S. 1921, as it then existed, by which the rights of the parties must be admeasured both as to the lienability of the many items constituting the accounts, and the rank to be accorded the several liens established thereunder. The relevant part of said section upon the first phase is as follows:

"Any person, corporation or copartnership, who shall, under contract express or implied, with the owner of any leasehold for oil and gas purposes, or the owner of any gas pipe line or oil pipe line, or with the trustee or agent of such owner, perform labor or furnish material, machinery and oil well supplies used in the digging, drilling, torpedoing, completing, operating or repairing of any oil or gas well, or who shall furnish any oil or gas well supplies, or perform any labor in constructing or putting together any of the machinery used in drilling, torpedoing, operating, completing or repairing of any gas well, shall have a lien upon the whole of such leasehold or oil pipe line, or gas pipe line, or lease for oil and gas purposes, the buildings and appurtenances, and upon the material and supplies so furnished and upon the oil or gas well for which they were furnished. and upon all the other oil or gas wells, fixtures and appliances used in the operating for oil and gas purposes upon the leasehold for which said material

and supplies were furnished or labor performed."

In this connection our attention necessarily is first directed to the meaning of the language employed declaratory of the lien provided for. Defendants urge the view that the word "used" in the phrase "used in the digging, drilling, torpedoing, completing, operating, or repairing of any oil or gas well,"constitutes a limitation upon the lienability of many items involved such as do not in fact become a part of the equipment necessary for the operation of the properties, either by consumption or attachment, although they be essential instrumentalities in the process of both development and operation. Authorities from other jurisdictions are presented in support of this contention, wherein many of like items have been held to be without the purview of lien laws.

To follow defendants' contentions would mean that the language of our statute must be given a restricted or limited interpretation. The cases cited would appear to have that effect, but upon analysis, the language of the statute construed thereby in a number of the cases relied on necessarily resulted in precluding the lienability of the items there involved. Even though it be conceded that in several other jurisdictions, lien laws are given a strict construction, this is not the rule in this state, for this court has many times broadly applied the attachment of liens under this and other lien provisions of our law. Cleveland v. Hightower, 108 Okla. 84, 234 Pac. 614; Commercial Oil Corporation v. Lumpkin, 118 Okla. 158, 241 Pac. 137; Logue & Thompson Co. v. Williams, 98 Okla. 160, 221 Pac. 1033; Sherbondy v. Tulsa Boiler & Machinery Co., supra; Joplin Sash & Door Works Co. v. Oklahoma Presbyterian College, supra; Kansas City Southern Ry. Co. v. Wallace, 38 Okla. 233, 132 Pac. 908.

The items here challenged consist of supplies, such as repairs for movable personal property used by lessees in improvement and operation of properties, repair parts for truck, floor sweepers, snatch block, bailer, wire nails, padlocks, oil cans, machine bolts, flash lights, hatchets, handles, hammer handles, wrench jaws, te'egraph cords, hammer, pipe reamer, bit gauge, manilla cable, emery paper, files, scissors, flash light batteries, spoke for tractor, cave catcher, water buckets, derrick broom, square, axe handle, augers, chisels, handsaw, drilling tools, parts for drilling machinery, drill cable, wire rope, bull rope, soft wire line, hand punch, pulling machine, tube catcher, and spudding shoe, used or purchased for use in the develop-

ment, operation and maintenance of the properties involved. In our view the language of the statute is not susceptible of either a limited construction or application with respect to the challenged items, for it is self-declaratory, in that any labor, supplies, materials, machinery "used in the digging, drilling, torpedoing, completing, operating, or repairing of any oil or gas well" is comprehended and lienable. That such items must become a part of the property by either consumption or attachment is not the basis of the law; it is the use thereof. The term "used," in its common meaning and acceptation, according to lexicons, means the employment of a thing for the accomplishment of a particular purpose. No term of limitation was employed by the Legislature, if it was the intention that the language of the statute was to have a restricted interpretation.

Neither does the history of the statute lend support to defendants' contention. When this statute was enacted by the Legislature of Oklahoma Territory in 1905, it was then dealing with an industry which had already been developed and expanded to that extent where it claimed the attention of the great captains of wealth, and enabled the new state of Oklahoma, upon its admission into the Union two years later, to assume at once, both in population and wealth, a rank above many of her sister states. It had already become apparent to the legislative branch of Oklahoma Territory that the general lien was inadequate to protect the laborer and the materialman in their right of compensation for service rendered and materials furnished in the further development of this natural resource that has added multiplied millions to our wealth. Thus it was, as with prophetic vision of amalgamation of Oklahoma Territory with Indian Territory, where the oil industry already appeared to be in a most flourishing condition, that the territorial Legislature in its wisdom extended the principle that "the laborer is worthy of his hire," in the enactment of the oil and gas lien law. In 1919, by amendment by the state Legislature, its scope as now under consideration was enlarged to meet what had then developed into a deficiency through the further expansion of the industry to that extent where the state has occupied in recent years both first and second place as an oil producing state.

We also take judicial notice of the fact, upon the ground of common knowledge, that the challenged items are essential and necessary supplies used in the development and operation of properties in an industry of

the first magnitude which of itself attracts the attention of capital and invites and induces the investment of large sums of money, as was done in the case at bar.

One other item not listed above, contained in the account of the Oil Well Supply Company, is also challenged as being nonlienable. This is an item of $8.75 in an account of $31,167.37, representing one day's rental of certain necessary drilling tools furnished to and used by lessees. Defendants in their attack thereon rely on the case of Arkansas Fuel Co. v. McDowell, 119 Okla. 77, 249 Pac. 717, wherein it was held, in paragraph 5 of the syllabus, that:

"One who rents 'fishing tools' to the owner of an oil or gas lease, at a stipulated price per day, for the use of such tools on a 'fishing job,' is not entitled to a lien for the rental value thereof, under sections 7464-7466, Comp. St. 1921"

—and where, in the body of the opinion in reference to the principle announced, it was said:

"With reference to the lien of the Acme Fishing Tool Company, we are of opinion the court erred in rendering judgment establishing a lien in its favor. This company neither furnished labor nor material, but this was purely a rental contract of certain tools with which to do a fishing job, and does not fall within the purview of the statute."

We think that to be a restricted or limited interpretation of the word "furnish" used to express the legislative will, as there is no legislative manifestation in the statute indicating an intention that the term should be given an interpretation other than that of its ordinary meaning.

"Words used in any statute are to be understood in their ordinary sense, except when a contrary intention plainly appears, and except also that the words hereinafter explained are to be understood as thus explained." Section 3528, C. O. S. 1921.

The word "furnish" is not one of the words "hereinafter explained." In its ordinary sense the term means to supply a thing for use in the accomplishment of a particular purpose. This may be either by sale absolute or by hire at a specified rate. The rental plan is not new to the oil industry, as is shown by the case relied on, and the case of U. S. Supply Co. v. Andrews, 71 Okla. 293, 176 Pac. 967, referred to therein. The interpretation of the law there made in that respect is inharmonious with the broad application of the statute made to other phases of the case, and is not consonant with the prior decisions of this court

where lien laws were involved. To hold that the statute gives to the one a lien for commodities furnished which become a part of the property, either by consumption in the use thereof or by attachment as a part of the equipment or machinery or otherwise, and that it denies to the other who likewise furnished commodities equally as essential and necessary as furnished by the one, though such commodities furnished by the other be not consumed nor become a part of the properties developed by attachment, and retain individuality, and be capable of further use upon completion of the immediate purposes for which they were purchased, is to say that the lawmaking body of the state acted in a most discriminatory manner in the enactment of the statute, when it is known as a matter of common knowledge that a large quantity of such necessary and essential commodities never become a part of the leasehold either by consumption or attachment thereto. In the language of Kansas City Southern Ry. Co. v. Wallace, supra:

"The Legislature that would make a discrimination at once so unjust and unreasonable would, in the very act, lay at its door an impeachment for besotted ignorance or gross partiality."

We are unwilling to make this intimation. In our view, therefore, we think the language of the statute was answered when the challenged items were furnished under the line of credit established by the agreement of the parties and employed in the development of the leaseholds involved, and to keep in repair the machinery and equipment used in the operation thereof. We, therefore, conclude that the items in question are lienable. The case of Arkansas Fuel Co. v. McDowell, supra, in so far as the same is in conflict with the conclusions here reached, upon this phase of the cause at bar, is hereby expressly overruled.

In this connection also defendants urge that it was not sufficiently shown that certain items admitted to be lienable, as well as a number of those challenged, were used by the lessees for the purposes for which they were furnished. Among the many items thus challenged, there was an item of $710.46 in the account of the Oil Well Supply Company. The evidence in this connection showed that this sum represented the difference between the selling price and the return or credit price for a carload of pipe sold and delivered to the defendant, Graham Oil & Gas Company, for use on the lease described as the northeast quarter (N. E. ¼) and southwest quarter (S. W. ¼) of section 6, township

24 north, range 10 east. The material was not so used, and by agreement of the parties the same was returned to the Oil Well Supply Company. We think the debtor was entitled to credit on its account in that sum, and to this extent defendants' contentions should be sustained, otherwise the record amply sustains the findings of the court that the items comprising the several accounts were furnished by the plaintiffs and used by the lessees in the development and operation of the properties involved.

"Where a jury is waived, and the cause tried to the court without a jury, and the findings and judgment of the trial court are amply supported by the weight of the evidence adduced at the trial, the appellate court is not at liberty to disregard the findings and judgment of the trial court." Keaton v. Branch, 104 Okla. 287, 231 Pac. 289.

. We therefore cannot say that the court erred in adjudging and decreeing the several accounts to be liens upon the respective properties against which the lien statements were filed, except that as to the judgment of the Oil Well Supply Company in the amount of $9,483.91 with a lien therefor against the oil and gas lease described as the northeast quarter (N. E. 1/4) and the southwest quarter (S. W. 1/4) of section 6, township 24 north, range 10 east, in Osage county, Okla., this should be reduced in the sum of $710.46, and to that extent the judgment and lien are hereby so modified.

Upon the question of the rank or dignity of the several liens, the statute appears to be equally as clear, for it is further provided by said section 7464, C. O. S. 1921, in express terms that:

"Such lien shall be preferred to all other liens or incumbrances which may attach to or upon said leasehold for gas and oil purposes and upon any oil or gas pipe line, or such oil and gas wells and the material and machinery so furnished and the leasehold for oil and gas purposes and the fixtures and appliances thereon subsequent to the commencement of or the furnishing or putting up of any such machinery or supplies; and such lien shall follow said property and each and every part thereof, and be enforceable against the said property wherever the same may be found; and compliance with the provisions of this article shall constitute constructive notice of the lien claimant's lien to all purchasers and incumbrancers of said property or any part thereof subsequent to the date of the furnishing of the first item of material or the date of the performance of the first labor."

Thereunder all accounts existent at the recordation of the July 1, 1920, contract on September 29, 1920, and thereafter continued with lien statements filed within four months of the last purchase, must take precedence over the general lien created by the contract, as the priority covenant of the contract was not projected into the transaction with the force intended by the parties thereto as by requirement of the pipe line company that all accounts for materials or supplies used by the lessees in the development and operation of the leaseholds then being incumbered with a general lien be adjusted and liquidated.

Since the properties had been developed to the extent of attraction as an investment in the manner here made, the pipe line company knew that such development and operation thereof must have required the use of a large quantity of materials, and at great cost, and that under the law, if any of the accounts therefor were outstanding, such creditors were given the right of a lien against the very property involved. Moreover, it knew that lessees could not fully execute their covenant of the contract requiring diligent operation of their properties without the use of further materials and supplies which, if purchased from dealers who then had outstanding accounts created in a manner as to constitute a single transaction, as here that the law would protect such dealers against the general lien created by the contract of July 1, 1920. Avoidance of the force of the statute therefore was within the power of the pipe line company as it could have brought itself within the protecting terms of the law, whereunder the priority of its lien would be secured as is now contended, by then and there, at the time of either the execution of the contract or the recordation thereof, having required the payment of all outstanding accounts. This was not done and the force of the law cannot now be postponed. Redman v. Murray W. Sales Co., 266 Fed. 272.

Of this class are the claims of Bessemer Gas Engine Company, Lon R. Stansbery, F. W. D. Truck Company, Atlas Supply Company, Frick-Reid Supply Company and Oil Well Supply Company. These the court properly held to be superior to the general lien created by the contract, but of equal rank with each other where the same properties were affected thereby. Atlas Supply Co. v. Bank of Commerce, 101 Okla. 57, 223 Pac. 159; Sherbondy v. Tulsa Boiler & Machinery Co., supra.

Accounts incurred subsequent to the recordation of the contract must take a lower rank to the general lien, held by the Prairie Oil & Gas Company. Of this class are the claims of Independent Torpedo Company and

Black, Sivalls & Bryson, Incorporated. These the court likewise held to be superior to the general lien of the pipe line company, and as of equal rank with the others above enumerated, where properties were affected thereby. This phase of the judgment cannot be sustained without extending the meaning of the language of the statute. This the plaintiffs of the last class urge on the theory that the parties to the contract of general lien must have contemplated that such a situation would arise in due course of the operation of the developed properties, and that the general lien did not ripen as to them until upon breach of the contract of July 1, 1920, which occurred subsequent to their accounts. This involves the consideration of the principle of law by the trial court applied referred to in our adversion to the first proposition which is not involved in this appeal for the reason there stated.

It may be said that they were not required to sell their materials or labor on open account when they were charged with notice of a general lien that would foreclose their priority upon the necessity of the establishment of their liens as a dernier resort for the payment of their accounts. Under our commercial custom vendors are not without protection in such circumstances as the practice of sale with retention of articles sold until payment of the purchase price is often applied. The language of the statute appears to be clear upon the subject, and hence, we cannot say that there is a plain intent of the Legislature that the language employed must be given an interpretation different from that of the common meaning and acceptation thereof. In this respect the judgment of the court must be modified to conform to the statute. The lien of the plaintiffs, Independent Torpedo Company and Black, Sivalls and Bryson, Incorporated, therefore, must be held to be inferior and junior to the general lien of the defendant the Prairie Oil & Gas Company, and thus the judgment is hereby so modified. Landers v. Bank of Commerce, 106 Okla. 59, 233 Pac. 200; Atlas Supply Company v. Bank of Commerce, supra.

Defendants further contend that the proceeds of the joint operation of the properties under the creditor's agreement of July 8, 1921, were erroneously impressed with the several liens as under the contract of July 1, 1920, the funds to the date of January 1, 1923, the period of limitation for the liquidation of the advance purchase price of oil produced by the lessees, should be treated as a credit on that transaction between the lessees and the defendant Prairie Oil & Gas

Company, as upon which proceeds a lien attached by virtue of said contract. This contention does not find support in the creditor's agreement, as it was expressly provided therein that the net funds thus derived were to be considered as a part of the properties from which they were produced. No contention is made that the parties were under any disability to make the agreement. The parties having so contracted, the case of Black v. Giarth, 88 Kan. 338, 128 Pac. 183, cited by defendants, is without application. The trial court conformably to this agreement decreed that an accounting of the joint operation thereunder of the properties should be had, and the amount found to be remaining, upon payment of the expense of such operation and other items therein provided for, should be distributable to the lien creditors in accordance with the rank accorded to the several liens, and ratably where such funds were affected by more than one of such liens. This part of the judgment, however, must necessarily be modified to fix the distribution in conformity with the rank of the several liens as fixed by the statute, and to that extent it is hereby so modified.

Defendants refer briefly to the fees awarded by the court to the several attorneys for the plaintiffs, and urge that they are excessive. These range in percentage of the claims involved approximately from 10 per cent. to 25 per cent. This involved the exercise of a sound judicial discretion. Awards in such cases should always be commensurate with the services rendered in the particular case. In this class of cases, the statute provides for a reasonable attorneys' fee. Section 7482, C. O. S. 1921; Key v. Hill, 93 Okla. 64, 219 Pac. 308; McGyure v. Duncan, 100 Okla. 217, 229 Pac. 199. While some of the awards here involved may appear to exceed just compensation, yet, when we take into consideration the time required in the trial of this case, as is evidenced by the voluminous record, we cannot say that the court erred in fixing the amounts of the respective awards.

For the foregoing reasons, therefore, the judgment of the district court, as hereby modified, is affirmed.

BENNETT, REID, LEACH, and HERR, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 1 C. J. p. 601. §7; 40 C. J. p. 1175, §860 (Anno). (2) 13 C. J. p. 268, §59; 40 C. J. p. 1173, §853; p. 1175, §860 (Anno). (3) 40 C. J. p. 1175, §860; 30 Cyc. pp. 1194, 1196. (4) 40 C. J. p. 1164, §845; p. 1166; §846 (Anno); p.

1167, §846.  (5) · 27 C. J. p. 931, §1; 39 Cyc. p. 846.  (6) 40 C. J. p. 1179, §§874, 876.  (7) 13 C. J. p. 525, §485; 34 Cyc. p. 908.  (8) 40 C. J. p. 1185, §895.  (9) 4 C. J. p. 877, §2853; p. 1153, §3161.